# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CCSB FINANCIAL CORP., | § | |
| | § | |
| Defendant Below, | § | No. 424, 2022 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| DEANN M. TOTTA, LAURIE | § | |
| MORRISSEY, CHASE WATSON, | § | C.A. No. 2021-0173 |
| AND PARK G.P., INC. | § | |
| | § | |
| Plaintiffs Below, | § | |
| Appellees. | § | |

Submitted: April 19, 2023
Decided: July 19, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery of the State of Delaware: **AFFIRMED**.

Kevin J. Connors, Esquire, Aaron E. Moore, Esquire, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Wilmington Delaware; Michael H. McGinley, Esquire (*argued*), Rick S. Horvath, Esquire, Stuart T. Steinberg, Esquire, DECHERT LLP, Philadelphia, Pennsylvania; Brett A. Scher, Esquire, Patrick M. Kennell, Esquire, KAUFMAN DOLOWICH & VOLUCK, LLP, New York, New York, *for Defendant Below, Appellant CCSB Financial Corp.*

Kevin H. Davenport, Esquire, Eric J. Juray, Esquire, John G. Day, Esquire (*argued*), PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware, *for Plaintiffs Below, Appellees DeAnn M. Totta, Laurie Morrissey, Chase Watson, and Park G.P., Inc.*

**SEITZ**, Chief Justice:

The corporate charter of a bank holding company capped at 10% the stock that could be voted by a "person" in any stockholder vote. During a proxy contest for three seats of a staggered board, the CCSB board of directors instructed the inspector of elections not to count 37,175 shares voted in favor of a dissident slate of directors. According to the board, the 37,175 shares exceeded the 10% voting limitation because certain stockholders were acting in concert with each other. If the votes had been counted, the dissident slate of directors would have been elected.

The CCSB corporate charter also provided that the board's "acting in concert" determination, if made in good faith and on information reasonably available, "shall be conclusive and binding on the Corporation and its stockholders." In a summary proceeding brought by the plaintiffs under 8 *Del. C.* § 225, the Court of Chancery found (1) the "conclusive and binding" charter provision invalid under Delaware corporate law; (2) the board's instruction to the inspector of elections invalid because the individuals identified by the board were not acting in concert; and (3) the board's election interference did not withstand enhanced scrutiny review. The court also awarded the plaintiffs attorneys' fees for having conferred a benefit on CCSB.

In this appeal, CCSB argues that the Court of Chancery erred when it invalidated the charter provision and reinstated the excluded votes. It claims that, rather than modifying the standard of conduct of the directors, the charter provision

2

simply modifies the judicial standard of review, which an informed stockholder vote can modify in analogous circumstances. It further contends that, even if the conclusive and binding provision is invalid, the Court of Chancery misapplied the burden of proof and ignored evidence that (1) the stockholders were acting in concert and (2) the board was acting in the best interests of CCSB when it invoked the voting limitation. Finally, it argues that the attorneys' fee award should be reversed because the plaintiffs received a personal benefit and did not confer a benefit on the company.

We affirm the Court of Chancery's judgment. The plaintiffs proved that the board breached its duty of loyalty by instructing the inspector of elections to disregard the 37,175 votes. The charter provision cannot be used to exculpate the CCSB directors from a breach of the duty of loyalty. Further, the court's legal conclusion and factual findings that the stockholders did not act in concert withstand appellate review. We also affirm the award of attorneys' fees to the plaintiffs.

I.

A.

Since 1922, Clay County Savings Bank (the "Bank") has operated as a savings and loan association near Kansas City in Clay County, Missouri.[1] CCSB Financial Corp. (the "Company" or "CCSB") was incorporated in 2002 as a Delaware holding

---

[1] Unless otherwise stated, the facts are drawn from the Court of Chancery's May 31, 2022 opinion, *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *2 (Del. Ch. May 31, 2022).

3

company for the Bank, which itself converted to a federally chartered savings bank in 2003. CCSB has a staggered board of directors, meaning that the entire board does not turn over at the annual meeting.

CCSB's stock trades on the over-the-counter market. As of December 3, 2020, the record date for the contested board election, CCSB had 743,071 shares of common stock outstanding. Mario Usera, the Bank's president and CEO and CCSB board member, beneficially owned 78,442 shares, or 10.56% of CCSB stock outstanding. Other board members also held CCSB stock, resulting in the board, collectively, beneficially owning 23.39% of outstanding stock.

A voting limitation ("Voting Limitation") is set forth in Article FOURTH of CCSB's certificate of incorporation:

> [I]n no event shall any record owner of any outstanding Common Stock which is beneficially owned, directly or indirectly, by a person who, as of any record date for the determination of stockholders entitled to vote on any matter, beneficially owns in excess of ten percent (10%) of the then-outstanding shares of Common Stock (the "Limit"), be entitled or permitted to any vote in respect of the shares held in excess of the Limit.[2]

---

[2] App. to Opening Br. at A0020.

The charter defines "affiliate" and "beneficial ownership" in accordance with Rule 12b-2[3] and Rule 13d-3,[4] respectively, under the Securities Exchange Act of 1934.[5]  As defined in the charter, "Person"

> [i]nclude[s] an individual, firm, *a group acting in concert*, a corporation, a partnership, an association, a joint venture, a pool, a joint stock company, a trust, an unincorporated organization or similar company, a syndicate, or any other group formed for the purpose of acquiring, holding or disposing of securities or any other entity.[6]

The Court of Chancery observed that "Article FOURTH defines 'person' and 'beneficial owner' using concepts like 'affiliate' and 'acting in concert' that result in the aggregation of shares across owners."[7]

Article FOURTH (C)(3) of the CCSB charter states that the CCSB board has "the power to construe and apply the provisions of this section and to make all determinations necessary or desirable to implement such provisions."[8]  That power includes determining "the number of shares of Common Stock beneficially owned by any person, . . . whether a person is an affiliate of another," and "whether a person has an agreement, arrangement, or understanding with another" relevant to a matter

---

[3] *See* 17 C.F.R. § 240.12b-2 ("An 'affiliate' of, or a person 'affiliated' with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.").

[4] *See* 17 C.F.R. § 240.13d-3 (listing factors for determination of beneficial ownership).

[5] App. to Opening Br. at A0021.

[6] *Id.* at A0022 (emphasis added).

[7] *Totta*, 2022 WL 1751741, at *2.

[8] App. to Opening Br. at A0022.

of beneficial ownership.[9]  Article FOURTH (C)(6), the "Conclusive-and-Binding Provision," provides that "any constructions, applications, or determinations made by the Board of Directors pursuant to this section in good faith and on the basis of such information and assistance as was then reasonably available for such purpose shall be conclusive and binding upon the Corporation and its stockholders."[10]

Prior to 2020, the CCSB board had not applied the Voting Limitation.  On at least one occasion, however, a stockholder had voted shares in excess of the limit.[11] Usera claimed this was "because 'the number of shares that were in excess of the 10 percent had no impact on ... the election and so there was no need to apply the' Voting Limitation."[12]  The Court of Chancery remarked that "[i]t is unclear from the record whether that was in fact the case."[13]

Not unexpectedly, Usera kept a "cheat sheet" that tracked the purchase and ownership of CCSB stock by friendly parties expected to support CCSB's leadership in an election.[14]  The cheat sheet also included running calculations of the number of shares needed to maintain control of CCSB.[15]  The Court of Chancery observed from the cheat sheet that "[f]rom November 1, 2016 to January 29, 2021, Usera

---

[9] *Id.*
[10] *Id.* at A0023.
[11] *See Totta*, 2022 WL 1751741, at *2.
[12] *Id.*
[13] *Id.*
[14] *Id.* at *5.
[15] *See id.*

brokered 23 transactions through which the Company, its directors, officers, and their family members bought stock from stockholders whom Usera considered friendly."[16]

B.

David Johnson is a longtime CCSB stockholder who has a variety of business interests. Relevant to the current dispute, Johnson held a controlling position and a board seat with First Missouri Bank, another community bank with branches near Kansas City; was chairman and CEO of Maxus Realty Trust Inc. ("MRTI"); and was the sole stockholder of Park G.P., Inc. ("Park"). As of the record date, Johnson claimed that he beneficially owned 73,948 CCSB shares or a 9.95% ownership interest, which included 3,398 shares owned by Park.

Over the years, Johnson looked for ways to increase his CCSB ownership interest. In 2015, Johnson asked the CCSB board to waive the Voting Limitation to allow him, his wife, and Park to acquire up to 24.99% of CCSB.[17] The Federal Reserve Bank of Kansas City, which monitors the control of regional banks through the Change in Bank Control Act ("CIBCA"), approved the request.[18] When Johnson presented his request to the CCSB board, however, it responded that while it "has

---

[16] *Id.*

[17] *See* App. to Opening Br. at A0219 (Park Letter to CCSB Requesting Waiver of Voting Limit).

[18] The Federal Reserve Bank of Kansas City approved Johnson and his wife's proposed acquisitions of more than 10% of CCSB shares each but limited any acquisitions by Park to below 5%. *See id.* at A0220.

7

the authority to determine the applicability of Section C [of Article FOURTH] as it relates to the stock ownership of any particular shareholder(s), the Board does not have the authority to simply waive the provision."[19]  In other words, the board reserved the right to apply the Voting Limitation to Johnson.

In another instance, Johnson attempted to acquire CCSB stock from a group of companies that had taken loans from Bond Purchase, LLC.  Johnson was an 85% owner and managing member of Bond Purchase.  The companies pledged their CCSB stock as collateral for loans but missed payments and were in default.  The companies rebuffed Johnson's offer to cure their default by selling their CCSB stock to Johnson.  Instead, the companies agreed to sell their CCSB stock to CCSB.[20] Bond Purchase responded by declaring a default and forcing a foreclosure sale of the companies' CCSB stock.  At the foreclosure sale, DEW, LLC, a company owned by Johnson's friend and associate David Watson ("D. Watson"), purchased 17,765 CCSB shares.  Like Usera, Johnson also kept a cheat sheet of friendly stockholders, where he listed DEW's 17,765 shares.[21]

In 2019, Johnson transferred 30,000 CCSB shares to MLake 70, LLC, a company associated with Chase Watson ("C. Watson"), D. Watson's son.

---

[19] *Id.* at A0224 (CCSB Response to Request for Waiver of Voting Limit).
[20] *See id.* at A0243 (*Robb v. Bond Purchase, LLC*, No. 15CY-CV09793 (Mo. Cir. Ct. Clay Cnty.)) ("When meeting in September, 2015, it was agreed in principal by Mario Usera, on behalf of CCSB Financial Corp, and Robb, on behalf of his companies, that CCSB Financial Corp would purchase the 23,007 shares of CCSB Financial Corp. stock . . . .").
[21] *See id.* at A0251.

C. Watson was also separately an affiliate of Johnson through MRTI, where he served as a Vice President. In a letter to Johnson, the Federal Reserve Bank of Kansas City flagged the transaction as a violation of the CIBCA:

> [W]e understand that you transferred 30,000 shares of CCSB stock to MLake 70, LLC (MLake), in order to bypass the 10 percent voting limitation per shareholder imposed by the Certificate of Incorporation of CCSB. This transfer of stock resulted in a violation of the CIBCA. The goal of our ownership review is to identify all parties presumed to be acting in concert as members of the Johnson Control Group, resolve the violations in a single Change in Control filing, and prevent future violations and untimely filings under the CIBCA.[22]

In addition to flagging the transfer of shares to C. Watson, the Federal Reserve identified DeAnn Totta as a Johnson affiliate who would need clearance for any owned shares.[23] Totta was Park's President and was part of Maxus Properties LLC's management, a company held by MRTI through a wholly owned subsidiary.

The Federal Reserve instructed Johnson either to unwind the transaction or file requests for C. Watson, Totta, and any of their immediate family members who had not been identified but held or controlled CCSB stock.[24] The resolution of this matter is unclear from the record.

---

[22] *Id.* at A0275–77.

[23] *See id.* at A0276 ("For example, DeAnn Totta, as a management official of Park, should be listed, along with the position she holds in Park, and the number of other CCSB shares, if any, she individually or through other associated companies, owns or holds with power to vote.").

[24] *See Totta*, 2022 WL 1751741, at *5.

9

C.

For the 2021 stockholder meeting, three of CCSB's seven director seats were up for election. Park nominated three candidates: DeAnn Totta, C. Watson, and Laurie Morrissey. As discussed, Totta and C. Watson were affiliated with Johnson through business entities such as Park and MRTI. C. Watson was also a manager of MLake 96 LLC, which owned 500 CCSB shares. Lastly, Morrissey was the owner and operator of a consulting business and was the beneficial owner of 100 CCSB shares. CCSB nominated Usera and two other incumbent directors.

In the months before the election, CCSB sent letters to certain stockholders owning shares in excess of a 5% threshold, including Johnson, and requested updated information on their beneficial ownership of CCSB shares.[25] CCSB specifically inquired about stock held as a "group pursuant to any agreement, arrangement or understanding (whether written or unwritten) for the purpose of acquiring, holding, voting or disposing of any shares of Company stock."[26] Johnson did not respond to the first two letters sent in October and November. CCSB sent a third letter on December 4, 2020, the day after the record date.

---

[25] *See* App. to Opening Br. at A0312–16.
[26] *Id.* at A0313 (CCSB Letter to David Johnson and Sandra Castetter).

10

At the same time, Johnson was exploring a sale of CCSB stock to D. Watson and hoped to complete a sale of 19,500 shares by the record date.[27] The sale closed on November 25, 2020, with Johnson selling the CCSB stock at market value to DEW. Johnson informed the Federal Reserve of the transaction on December 15, 2020, and wrote:

> I recently sold a total of 19,500 shares of CCSB (which is less than 3% of CCSB's outstanding shares) to DEW LLC which is owned by David Watson and wanted to provide notice of the sale for your records. DEW LLC owned shares of CCSB before this purchase, but DEW LLC is not part of the Johnson Control Group. Mr. Watson is a retired business acquaintance who owns less than a 6% ownership interest in Maxus Realty Trust, which has hundreds of shareholders ....
>
> The shares were sold in an arms' length transaction for fair market value ($16.42 per share; see CCSB web page attached). Neither Mr. Watson nor any member of the Johnson Control Group is a party to any agreement, contract, understanding, relationship, or other arrangement regarding the acquisition, voting, or transfer of voting securities of CCSB.[28]

The Court of Chancery noted that "[t]he Federal Reserve did not object to the sale, conclude that DEW was part of the Johnson Control Group, conclude that Johnson and DEW were acting in concert, or ask for any other information from Johnson after the sale to DEW."[29] After this, on December 17, 2020, Johnson responded to

---

[27] *See id.* at A0318 ("I am going to have David watson [sic] buy 19500 shares from me ASAP . . . want to beat the record date . . . he wants to place in DEW LLC which has an account at Fidelity . . . .").

[28] *Id.* at A0373–74.

[29] *Totta*, 2022 WL 1751741, at *8.

11

CCSB's information requests and informed the company that he beneficially owned 87,348 shares as of September 30, 2020, and 73,948 shares as of December 3, 2020.

Usera was dissatisfied with Johnson's update. Minutes from a January 20, 2021 board meeting show that Usera voiced concerns about the accuracy of the information Johnson provided and stated that he had "evidence to believe that Mr. Johnson may be acting in concert with others," including D. Watson.[30] The board did not, however, follow up to request more information from Johnson.

The board also "did not investigate whether any other stockholder was potentially acting in a manner that could justify invoking the Voting Limitation, including Usera."[31] This is despite the fact that Usera had been actively monitoring proxy vote developments and encouraging votes in favor of the incumbent board.[32] The board was willing to let Usera "self-report" his stock and overlook the fact that he had previously failed to include his daughter's stock as part of his own beneficial ownership.[33]

---

[30] App. to Opening Br. at A0324–26.

[31] *Totta*, 2022 WL 1751741, at *9.

[32] *See id.* at *8 ("When a stockholder who Usera expected to vote did not vote, Usera contacted Broadridge for the stockholder's contact details and reached out to the stockholder directly.").

[33] *See* Defendant CCSB Financial Corp.'s Answering Trial Brief at 26 n.94, *Totta*, 2022 WL 1751741 ("Plaintiffs' Opening Trial Brief tries to make a theme out of questioning why the CCSB Board never conducted an independent inquiry of Mr. Usera's holdings, because he's a larger shareholder, too. The answer is very simple: he self-reports and provides share documentation that is readily verifiable. The Board thus need not conduct any independent inquiry, because Mr. Usera isn't hiding anything." (internal citations omitted)); Usera Dep. Tr. at 145:18–146:14 (Usera acknowledging he failed to include his daughter's shares in his beneficial ownership report).

12

On January 18, 2021, in a separate litigation brought by Usera against Johnson, Usera's counsel wrote to D. Watson, DEW, and another affiliated entity requesting beneficial ownership information. D. Watson replied on January 27, 2021, and declared that DEW owned 37,175 shares, that DEW was neither affiliated with any other stockholder nor part of an agreement to vote shares in any way, and that he would vote DEW's shares in favor of his son, C. Watson.

D.

On January 28, 2021, the board convened the 2021 annual meeting of stockholders. Before the meeting the board met "to discuss whether stockholders were acting in concert, whether they were in violation of the 10% beneficial ownership rule . . . and whether the Board of Directors was in a position to enforce its authority under [Article FOURTH]."[34] The board considered Johnson's December 17, 2020 letter and the communications with D. Watson and DEW regarding D. Watson's beneficial ownership of stock and determined that Johnson, his wife, D. Watson, C. Watson, Morrissey, and Totta were "acting in concert in order to get their alternate slate elected to CCSB['s] . . . Board of Directors."[35] The board concluded that it had authority to apply the Voting Limitation and that the group had violated the Voting Limitation.

---

[34] App. to Opening Br. at A0327 (January 28, 2021 Special Board Meeting Minutes).
[35] *Id.* at A0329.

13

The board instructed Stephanie Kalahurka, CCSB's counsel and the inspector of elections, not to count votes for the Park nominees in excess of 10% belonging to Johnson and his associates.[36] The board provided a table similar to the following that set forth the stock ownership of each person and concluded with a calculation that 37,416 shares were in excess of the 10% limit.[37]

| Shareholder/Broker | Beneficial Owner(s) | Source | Number of Shares |
| --- | --- | --- | --- |
| Charles Schwab | David Johnson | Letter to the Corporate Secretary dated 12/17/2020 | 28,025 |
| National Financial Services LLC | David L Johnson and Sandra L Cassetter | Letter to the Corporate Secretary dated 12/17/2020 | 42,525 |
| National Financial Services LLC (Canvas Wealth Advisors) | David E. Watson | Letter to the Corporate Secretary dated 12/17/2020 | 37,150 |
| National Financial Services (MLake LLC) | Chase Watson | Nomination Letter from Park GP | 500 |
| Unknown | Laurie Morrissey | Nomination Letter from Park GP | 100 |
| Wells Fargo (Park GP) | David Johnson and DeAnn Totta | Letter to the Corporate Secretary dated 12/17/2020 | 1,398 |
| Park GP, Inc. | David Johnson and DeAnn Totta | Registered Shares | 2,000 |
| DEW LLC | David E. Watson | Registered Shares | 25 |

---

[36] *See id.* at A0335–36 (CCSB Board Letter to Kalahurka).
[37] *Id.*

| Total | | | 111,723 |
|---|---|---|---|
| | | | |
| Outstanding Shares | | | 743,071 |
| 10% | | | 74,307 |
| | | | |
| Amount in Excess of 10% | | | 37,416 |

The board instructed Kalahurka not to count any of D. Watson's 37,175 beneficially owned shares, rather than just the 19,500 from the November 2020 transaction with Johnson. The board did not tell stockholders that the Voting Limitation would be applied to the votes in favor of Park's nominees.

The Court of Chancery observed that the board excluded votes without "conduct[ing] an investigation into whether any other stockholder or group of stockholders, including insiders such as Usera, were acting in concert for purposes of applying the Voting Limitation."[38] Kalahurka also "performed no investigation of her own into any stockholder's ownership, instead relying entirely on the Board's letter and Usera's self-reported stockholdings."[39]

The final vote tally was 359,336 votes for Usera and the other incumbent directors and 322,859 votes for the Park nominees. Kalahurka withheld 37,416 votes from the Park nominees and 4,134 votes from the incumbent directors, for a total of

---

[38] *Totta*, 2022 WL 1751741, at *10.
[39] *Id.*

15

41,550 ineligible votes.[40]  If Kalahurka had counted DEW's 37,175 shares, the Park nominees would have received 360,034 votes.

E.

After a half-day trial on a paper record, the Court of Chancery found that the board improperly instructed the inspector of elections to disregard DEW's 37,175 votes.  As a preliminary matter, the court had to decide what standard of review should apply to the board's actions.  Without the Conclusive and Binding Provision, enhanced scrutiny would apply because the board inserted itself into an election contest and ended up dictating the result.  The incumbent directors argued, however, that the Conclusive and Binding Provision shielded the board's action from all but business judgment review.

The Court of Chancery disagreed.  First, the court observed that "[f]iduciary duties arise in equity and are a fundamental aspect of Delaware law."[41]  The Constitution of 1897, the court reasoned, retained the divide between law and equity in the Delaware Court of Chancery.  The General Assembly has also conferred jurisdiction on the Court of Chancery to decide all matters and causes in equity.  Thus, according to the court, the Court of Chancery has the exclusive authority as a

---

[40] Usera had self-reported a 10.56% position, resulting in his excess shares being ineligible as well. *See* App. to Opening Br. at A0369.
[41] *Totta*, 2022 WL 1751741, at *14.

16

constitutional and statutory matter to supervise and enforce equitable rights and fiduciary relations.

The Chancellor reasoned that, within constitutional limits, "the General Assembly can replace equity with statutory law."[42]  While it has done so in the alternative entity space, it has "acted cautiously to limit specific default rules of equity" for corporations.[43]  After reviewing the limited areas where the court has modified traditional corporate fiduciary duties, the court concluded that, without an express statutory authorization, "[t]he Conclusive-And-Binding Provision cannot conclusively empower the Board to make determinations under a good faith standard.  The provision cannot prevent the court from applying equitable principles to evaluate the Board's decision."[44]

Next, the court decided to "twice test" the board's actions, first for legal authorization and second for equity.  The court found that the board's actions failed both inquiries.  To start, the court reviewed whether the board correctly applied the Voting Limitation when it "determined that Johnson, his wife, D. Watson, C. Watson, Morrissey, and Totta were 'a group acting in concert' whose shares could thus be aggregated as the shares of a single 'person' under the Voting Limitation."[45]

---

[42] *Id.*
[43] *Id.* at *16.
[44] *Id.* at *19.
[45] *Id.* at *23.

"Acting in concert" was not defined in the Voting Limitation, which led the court to resort to the dictionary to discover its meaning. As the court held, "persons act in concert when they have an agreement, arrangement, or understanding regarding the voting or disposition of shares."[46]

The court found there was insufficient evidence that Johnson and D. Watson were acting in concert.[47] D. Watson testified that he had not entered into any agreements concerning the voting of his CCSB shares, and the court found this credible.[48] And in the absence of evidence of an agreement, the sale of Johnson's stock to D. Watson and D. Watson's voting in favor of his son, C. Watson, were not indicative of an understanding between the two.[49] Importantly, the sale of stock was comparable to similar transfers between CCSB insiders, and CCSB "strenuously argued that those stockholders were not acting in concert with each other when they did so."[50] That D. Watson would then use his shares to vote for his son, C. Watson, to join the board was also "both unsurprising and unobjectionable."[51] The court therefore concluded that the Voting Limitation was improperly applied to D. Watson. The court invalidated the board's instruction to the inspector of elections to disregard DEW's votes.

---

[46] Id. at *24.
[47] See id. at *27.
[48] See id. at *26.
[49] See id.
[50] Id.
[51] Id.

18

The Court of Chancery also awarded attorneys' fees to the plaintiffs. As the court explained, under the corporate benefit doctrine, the litigation conferred substantial benefits to CCSB stockholders by vindicating "sacrosanct" stockholder voting rights; applying and interpreting the Voting Limitation; and invalidating the incumbent board's actions by applying enhanced scrutiny.[52] The "judgment also fortifie[d] the Company's stockholder franchise generally," justifying the fee award.[53]

## II.

For its first argument on appeal, CCSB raises a single legal issue, which we review *de novo*.[54] CCSB contends that the Court of Chancery erred by invalidating the Conclusive and Binding Provision. As the argument goes, subject only to the condition that a charter provision does not violate the laws of this State, section 102(b)(1) of the DGCL allows almost unlimited freedom in charter provisions. According to CCSB, the laws of this State do not invalidate the Provision because, "in analogous circumstances, Delaware courts have recognized that an informed stockholder vote can impact the standard of review."[55] CCSB argues that the Court

---

[52] *Totta v. CCSB Fin. Corp.*, 2022 WL 16647972, at *2 (Del. Ch. Nov. 3, 2022) [hereinafter *Fee Decision*].

[53] *Id.*

[54] *Activision Blizzard, Inc. v. Hayes*, 106 A.3d 1029, 1033–34 (Del. 2013).

[55] Opening Br. at 29–31 (citing *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 304 (Del. 2015) then citing *In re MFW S'holders Litig.*, 67 A.3d 496, 526 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014)).

of Chancery improperly relied on authorities addressing a board's power to modify the director's substantive fiduciary duties as opposed to what the charter provision does here — modify the court's standard of review for the board's election decisions. It claims that the Conclusive and Binding Provision furthers the goals of the CIBCA to provide greater protection against community bank takeovers.

In our view, however, the CCSB directors are attempting to use the Conclusive and Binding Provision to exculpate themselves from a breach of the duty of loyalty, which is prohibited by Delaware statute and public policy. In *Salzberg v. Sciabacucci*, this Court upheld a corporate charter provision requiring that all claims brought under the Securities Act of 1933 be filed in federal court.[56] To frame the analysis in *Salzberg*, this Court started with Section 102(b)(1), which spells out the permissible contents of the certificate of incorporation:

> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters: (1) Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State. Any provision which is required or permitted by any section of this chapter to be stated in the bylaws may instead be stated in the certificate of incorporation[.][57]

---

[56] 227 A.3d 102, 137 (Del. 2020).
[57] 8 *Del. C.* § 102(b)(1).

As a general observation about Section 102(b)(1) and the DGCL, this Court in *Salzberg* remarked that Delaware allows for "immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise."[58] The DGCL "is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters and judicially imposed principles of fiduciary duty are honored."[59] Further, "Delaware's corporate statute is widely regarded as the most flexible in the nation because it leaves the parties to the corporate contract (managers and stockholders) with great leeway to structure their relations, subject to relatively loose statutory constraints and to the policing of director misconduct through equitable review."[60]

We also noted in *Salzberg*, however, that the statute contains an important constraint – charter provisions are only valid "if such provisions are not contrary to the laws of this State."[61] The "laws of this State" include "statutory enactment[s] or a public policy settled by the common law or implicit in the General Corporation Law itself."[62]

---

[58] *Salzberg*, 227 A.3d at 116.

[59] *Id.* (quoting *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996)).

[60] *Id.* (quoting *Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 845 (Del. Ch. 2004)); *see also Manti Holdings, LLC v. Authentix Acquisition Company, Inc.*, 261 A.3d 1199, 1217–19 (Del. 2021) (discussing "how the DGCL reflects Delaware's public policy favoring private ordering").

[61] *Salzberg*, 227 A.3d at 115 (quoting 8 *Del. C.* § 102(b)(1)). The plaintiffs did not argue that the Conclusive and Binding Provision is not authorized by Section 102(b)(1), so we do not address it here.

[62] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952).

In *Salzberg*, this Court held that the federal forum provisions did not violate Section 102(b)(1) because they did not transgress any laws or the public policy of this State. The Conclusive and Binding Provision, however, is fundamentally different than a federal forum provision. A federal forum provision directs federal securities claims to another forum for resolution – the federal courts, which apply their federal law expertise to the claims. By contrast, the Conclusive and Binding Provision strips the Court of Chancery of its authority to apply established standards of review to breach of fiduciary duty claims. As explained below, the Conclusive and Binding Provision cannot exculpate fiduciaries from breach of duty of loyalty claims because it is contrary to the laws of this State and its public policy.

If a board improperly interferes with a director election, it breaches its duty of loyalty.[63] When the Court of Chancery reviews a claim in this context, the court, as it did here, performs a two-step review – first, it tests the legality of the board's action under the charter, and second, it applies enhanced judicial review under

---

[63] *See Coster v. UIP Companies, Inc.*, 2023 WL 4239581, at \*11–13 (Del. June 28, 2023) (requiring "enhanced judicial scrutiny" for "board action that interferes with a corporate election or a stockholder's voting rights in contests for control"); *Pell v. Kill*, 135 A.3d 764, 790 (2016) (observing that director interference with a stockholder election "typically amounts to an unintentional violation of the duty of loyalty" (quoting *Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 602 (Del. Ch.2006)); *Mercier v. Inter-Tel (Delaware), Inc.*, 929 A.2d 786, 807 (2007) (noting that enhanced review of director action interfering with stockholder elections implicates "the question of loyalty that pervades all fiduciary duty cases"); *Blasius Industries, Inc. v. Atlas Corp.*, 564, 663 A.2d 651 (1988) (finding a breach of the duty of loyalty when a board improperly interferes with a stockholder vote, even if actions taken in good faith).

established standards.[64]  CCSB argues in essence that the Conclusive and Binding Provision eliminates the first step, and requires business judgment review for the second step.  In other words, even if the board breaches its fiduciary duty of loyalty, the Conclusive and Binding Provision exculpates the board from liability.  Section 102(b)(7), however, specifically prohibits a charter provision that directly or indirectly limits director liability for breaches of the duty of loyalty.[65]

A similar argument was addressed in *Sutherland v. Sutherland*.[66]  A stockholder alleged that two of his siblings who were controlling stockholders, directors, and officers, caused family corporations to engage in self-dealing and wasteful transactions.  The defendants moved to dismiss and invoked what they argued were exculpatory charter provisions that "sterilized" any director interest in conflicted transactions.  The charter provision, according to the defendants, made

---

[64] *See Coster*, 2023 WL 4239581, at *6 ("[I]nequitable action does not become permissible simply because it is legally possible." (quoting *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971))); *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017) ("[D]irector action is 'twice-tested,' first for legal authorization, and second by equity." (quoting *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007))).

[65] *See Sample*, 914 A.2d at 667 n.65 (noting that an attempt to absolve directors of liability as long as actions were taken in good faith would violate Section 102(b)(7)); *Zirn v. VLI Corp.*, 621 A.2d 773, 783 (Del. 1993) (holding that provision purporting to insulate directors from liability for breaches of fiduciary duty "does not shield directors from liability for equitable fraud); *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 32 (Del. Ch. 2014) ("A provision like the Exculpatory Clause 'will not place challenged conduct beyond judicial review.' (quoting 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 6.02[7] at 6–19 (2013)); *Lee v. Pincus*, 2014 WL 6066108, at *9 (Del. Ch. Nov. 14, 2014) (explaining that a contractual lockup restriction on stock "does not eliminate" the fiduciary duty of loyalty owed by directors to all stockholders).

[66] 2009 WL 857468, at *3 (Del. Ch. Mar. 23, 2009).

the directors disinterested and therefore triggered business judgment rule review, even for transactions where entire fairness would apply.

Although the court found as an initial matter that the "provision at issue simply deals with issues of quorum and does nothing to sanitize disloyal transactions," the court went on to address the defendants' argument that the charter provision immunized all interested transactions from entire fairness review, meaning "the only basis that would remain to attack a self-dealing transaction would be waste."[67]

The Court of Chancery held that, "[i]f the meaning of the above provision were as the defendants suggest, it would effectively eviscerate the duty of loyalty for corporate directors as it is generally understood under Delaware law."[68] According to the court, "[w]hile such a provision is permissible under the Delaware Limited Liability Company Act and the Delaware Revised Uniform Limited Partnership Act, where freedom of contract is the guiding and overriding principle, it is expressly forbidden by the DGCL."[69] The court relied on Section 102(b)(7) and held that "[t]he effect of the provision at issue would be to do exactly what is forbidden. It would render any breach of the duty of loyalty relating to a self-dealing

---

[67] *Id.* at *4.
[68] *Id.*
[69] *Id.*

transaction beyond the reach of a court to remedy by way of damages."[70] The charter

provision was therefore determined to be "void as 'contrary to the laws of this State'

and against public policy."[71]

The *Sutherland* charter provision, as interpreted by the defendants, had the

effect of shifting the court's standard of review from entire fairness to business

judgment. Here, the charter provision operates more directly – it requires the

business judgment standard of review for board action that would ordinarily require

enhanced scrutiny. Even if, as happened here, the board improperly interfered with

the election, the Conclusive and Binding provision would, in CCSB's view, pre-

empt the Court of Chancery's legal and equitable review and exculpate the board

from liability. Section 102(b)(7), however, expressly prohibits this result.

Exculpation is also inconsistent with the public policy of this State to hold fiduciaries

accountable for breaches of the duty of loyalty.[72] As the Court of Chancery observed

---

[70] *Sutherland*, 2009 WL 857468, at *4.

[71] *Id.*; *see also Siegman v. Tri-Star Pictures, Inc.*, 1989 WL 48746, at *7–8 (Del. Ch. May 5, 1989) (recognizing, on a motion to dismiss, that a charter provision adopted as part of a merger purporting to exculpate directors for breach of the duty of loyalty could run afoul of Section 102(b)(7)).

[72] *See Manti*, 261 A.3d at 1204 ("As a matter of public policy, there are certain fundamental features of a corporation that are essential to that entity's identity and cannot be waived."); Gabriel Rauterberg & Eric Talley, *Contracting Out of the Fiduciary Duty of Loyalty: An Empirical Analysis of Corporate Opportunity Waivers*, 117 COLUM. L. REV. 1075, 1119 (2017) ("[T]he duty of loyalty is . . . traditionally unyielding to private, contractual end-runs."); Edward P. Welch, Robert S. Saunders, *Freedom and Its Limits in the Delaware General Corporation Law*, 33 DEL. J. CORP. L. 845, 859 (2008) ("The clear, negative implication of section 102(b)(7) is that a provision in a certificate of incorporation that purported to exculpate directors for breaches of the duty of loyalty would be invalid and unenforceable. As a result, scholars consider the directors' duty of loyalty to be a mandatory feature of Delaware corporation law."); *Jones Apparel Grp.*, 883 A.2d at 849 ("[T]o permit a deviation [in charter provisions] beyond that expressly permitted by

in *Sutherland*, the option to alter or eliminate fiduciary duties, if desired, resides in the land of alternative entities, not through a Delaware corporation formed under the DGCL.

## III.

After disregarding the Conclusive and Binding Provision, the Court of Chancery found that Johnson and D. Watson were not acting in concert. The board's instruction to the inspector of elections was therefore improper. CCSB argues that the court erred in this conclusion because it failed to apply the correct definition of "acting in concert" and misapplied the burden of proof, leading to a materially incorrect finding of fact. Our review is *de novo* for the court's legal determinations, and we defer to its factual findings, unless they are clearly wrong.[73]

---

the statute would contravene Delaware public policy."); *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001) ("The purpose of [Section 102(b)(7)] was to permit stockholders to adopt a provision in the certificate of incorporation to free directors of personal liability in damages for due care violations, but not duty of loyalty violations, bad faith claims and certain other conduct."); William T. Allen et. al., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 BUS. LAW. 1287, 1320 (2001) (Noting that director liability stemming from entire fairness or enhanced scrutiny review is "consistent with public policy that confines director liability for damages primarily to situations where the directors benefit from self-interested transactions or consciously breach their fiduciary duties."); *McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000) (noting that exculpatory "provisions cannot provide protection for directors who breach their duty of loyalty"); R. Franklin Balotti, *Elimination or Limitation of Director Liability for Delaware Corporations*, 12 DEL. J. CORP. L. 5, 18 (1987) ("[E]xclusions to section 102(b)(7) were the result of obvious public policy considerations."); *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 270, 5 A.2d 503, 510 (1939) (explaining that the duty of loyalty rests "upon a broader foundation of wise public policy").

[73] *See Backer v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 94 (Del. 2021); *Boardwalk Pipeline Partners, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1112 (Del. 2022).

A.

The CCSB charter does not define "acting in concert." The Court of Chancery therefore consulted the Merriam-Webster dictionary.[74] The Merriam-Webster dictionary defines "concert" as "agreement in design or plan: union formed by mutual communication of opinion and views."[75] Applying this definition, the Court of Chancery then determined that "persons act in concert when they have an agreement, arrangement, or understanding regarding the voting or disposition of shares."[76]

In the court's view, this definition had the added benefit of "track[ing] the general corporate law understanding" of acting in concert.[77] It also corresponded to the securities law definition and matched Section 203 of the DGCL's definition of ownership.[78] Further, the definition lined up with CCSB's understanding of the term. In correspondence with Johnson and other stockholders, CCSB inquired about the number of shares held by them or any affiliate "pursuant to any agreement, arrangement or understanding (whether written or unwritten) for the purpose of

---

[74] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract. This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.").

[75] *Concert*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/concert (last visited April 11, 2023).

[76] *Totta*, 2022 WL 1751741, at *24.

[77] *Id.*

[78] *Id.*

27

acquiring, holding, voting or disposing of any shares of Company stock."[79] In our view, this interpretation of "acting in concert" is legally sound.

Yet CCSB claims "the Chancery Court overlooked the fact that 'acting in concert' is defined by regulation."[80] The CIBCA defines "acting in concert" as "knowing participation in a joint activity or parallel action towards a common goal of acquiring control of a covered institution whether or not pursuant to an express agreement."[81] CCSB contends that "Delaware courts have long recognized that statutes bearing directly on the subject matter of a contract 'will be given effect in the application and enforcement of the contract' unless the contract explicitly states otherwise."[82]

CCSB did not argue below that the CIBCA definition should apply. The argument is waived,[83] and, in any event, CCSB acknowledged at least twice that "acting in concert" was an undefined term.[84] CCSB also argued below that "the lack of a definition of 'acting in concert' does not mean it cannot be fairly understood

---

[79] App. to Opening Br. at A0315–16.
[80] Opening Br. at 47.
[81] 12 C.F.R. § 303.81.
[82] Reply Br. at 19 (quoting *Koval v. Peoples*, 431 A.2d 1284, 1286 (Del. Super. 1981)).
[83] *See* Supr. Ct. R. 8.
[84] *See* Reply Brief in Further Support of Defendant CCCS Financial Corp.'s Rule 12(B)(6) Motion to Dismiss at 11–12, *Totta*, 2022 WL 1751741 (objecting to plaintiffs' narrow definition of "acting in concert" and highlighting that it is an "undefined term in the CCSB Certificate of Incorporation to begin with"); Defendant CCSB Financial Corp.'s Answering Trial Brief at 41, *Totta*, 2022 WL 1751741 (acknowledging "acting in concert" is "a term itself not defined"); *see also In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 55 (Del. 2006) (finding Rule 8 precluded appellants' argument that inquiry into board's exercise of due care required collective rather than director-by-director analysis because it contradicted argument made at trial).

28

and properly applied" and urged the court to "apply the plain language of the Certificate."[85]

Further, the CIBCA definition is extrinsic evidence that can only be considered to resolve ambiguities, not create them.[86]  For instance, in *Smartmatic International Corp. v. Dominion Voting Systems International Corp.*, the court grappled with a license agreement dispute over the geographic boundaries of a noncompetition provision.[87]  The parties disagreed on whether the words "in the United States" included Puerto Rico.  One of the parties argued that the definition of United States should be consistent with its patent law definition, which includes Puerto Rico.  The Court of Chancery "conclude[d] that the definition of 'United States' under federal patent law is extrinsic evidence that the Court should not rely on in determining whether the noncompetition provision is ambiguous."[88]  The court reasoned that the case was not one "where the definition of United States 'c[ould] only be known through an appreciation' of federal patent law."[89]  In other words, the

---

[85] Defendant CCSB Financial Corp.'s Answering Trial Brief at 38, 41 n.140, *Totta*, 2022 WL 1751741.

[86] *See City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) (rejecting use of DGCL Section 278 to help interpret the meaning of "any liabilities" in a trust agreement where provision was not mentioned in the agreement and the agreement was otherwise unambiguous); *Town of Cheswold v. Cent. Delaware Bus. Park*, 188 A.3d 810, 819–21 (Del. 2018) (holding that use of zoning ordinance to interpret an unambiguous consent decree was an erroneous use of extrinsic evidence).

[87] 2013 WL 1821608, at *1 (Del. Ch. May 1, 2013).

[88] *Id.* at *14 (internal quotations added).

[89] *Id.* (quoting *City Investing*, 624 A.2d at 1198).

"context and circumstances" of the agreement did not suggest that the parties intended to impart a specific meaning from patent law to the term.[90] The court arrived at this conclusion after considering that the license agreement did not refer to U.S. patent law, was governed by state law, and covered topics beyond patentable technology.[91] As such, the relevance of the U.S. patent law definition of "United States" was not necessarily apparent and did not justify looking beyond the contract for its meaning.[92]

Here, the CCSB charter does not mention the CIBCA or suggest that the statute should be used to interpret the meaning of terms within the charter.[93] It does, however, repeatedly refer to the DGCL and the Securities Exchange Act of 1934.[94] The Court of Chancery considered these statutory sources to help determine the plain meaning of "acting in concert."[95] The charter also covers a range of governance

---

[90] *City Investing*, 624 A.2d at 1198; *see also Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017) (considering the "commercial context" of a transaction).

[91] *See Smartmatic*, 2013 WL 1821608, at *14.

[92] *See General Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992) ("[W]e have not held that all state regulations are implied terms of every contract entered into while they are effective, especially when the regulations themselves cannot be fairly interpreted to require such incorporation.").

[93] *See Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *8 (Del. Ch. Nov. 2, 1995) ("Moore argues that the term 'fair market value' in the Purchase Agreement was intended to incorporate the 'fair value' standard employed in Delaware's appraisal statute, 8 *Del. C.* § 262(a). . . . Nothing in the Purchase Agreement supports a conclusion that the contracting parties intended for 'fair market value' to mean 'fair value' within the meaning of 8 *Del. C.* § 262(a).").

[94] *See* App. to Opening Br. at A0020–21, A0025–27.

[95] *See Active Asset Recovery, Inc. v. Real Est. Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (noting that nonuse of a term when other terms are expressly included "speaks volumes" towards the term's exclusion).

issues beyond the change in control matters that could be relevant to the CIBCA. Article THIRD, for example, states the corporate purpose of the Company, a matter governed by the DGCL rather than the CIBCA.[96]  In this context, there is insufficient evidence to demonstrate that the parties intended to use CIBCA to interpret the otherwise unambiguous terms of the charter.[97]

Finally, the internal affairs of a Delaware corporation are governed by Delaware law.[98]  This Court has held that the voting rights of stockholders in particular "fall squarely within the purview of the internal affairs doctrine."[99]  As the shareholder franchise is at the center of the current controversy, the Court of Chancery did not err by applying Delaware law to interpret the terms of the Voting Limitation.

## B.

The Court of Chancery stated clearly that "Plaintiffs bear the burden of proof" when determining "whether the Board correctly applied the Voting Limitation."[100] CCSB nonetheless asserts that the court "shifted that burden to CCSB in its actual

---

[96] *See* App. to Opening Br. at A0020.
[97] *See Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used . . . to create an ambiguity.").
[98] *See VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005).
[99] *Id.* at 1115.
[100] *Totta*, 2022 WL 1751741, at *12.

31

analysis."[101]  It relies on the Court of Chancery's summary of the facts in this case, where the court stated that "[n]one of [the presented] facts, individually or in the aggregate, support a finding that Johnson and D. Watson are or were acting in concert."[102]

The court did not improperly shift the burden of proof.  CCSB's argument resembles the argument made in *Judicial Watch, Inc. v. University of Delaware*, where "Appellants argue[d] that the Superior Court erroneously shifted the burden of proof to them when it stated, 'Appellants have provided nothing other than unsupported speculation in opposition to [Appellee]'s representation.'"[103]  This Court looked beyond the Superior Court's general statement and found that "an examination of the court's entire analysis reveals that the court did not erroneously place the burden of proof on Appellants."[104]

The Court of Chancery found persuasive D. Watson's testimony during his deposition that he had not entered into any arrangements that would qualify as acting in concert.[105]  The court also found unpersuasive CCSB's evidence to the contrary.[106]

---

[101] Reply Br. at 22–23.
[102] *Totta*, 2022 WL 1751741, at *26.
[103] 267 A.3d 996, 1007 (Del. 2021).
[104] *Id.*
[105] *Totta*, 2022 WL 1751741, at *26.
[106] *See id.* ("It is unsurprising that Johnson would choose to sell his shares in excess of 10% of the Company's outstanding shares; in his hands, those shares cannot vote and are effectively useless to him in his efforts to seat directors on the Board.  It is unobjectionable that Johnson would choose to sell those non-voting shares to his friend and business partner, D. Watson. . . . It is also both unsurprising and unobjectionable that D. Watson would vote for his son to join the Board.").

That the Court of Chancery weighed the evidence does not mean it misapplied the burden of proof.

For the first time on appeal, CCSB relies on the Federal Reserve's 2019 letter to Johnson, where it flagged Johnson's stock sale to C. Watson. The Federal Reserve noted in the letter that the holdings of C. Watson's immediate family members would also need to be approved as presumptive members of the Johnson Control Group.

There are three problems with this argument. First, CCSB did not make the argument below, and it is waived. Second, the record does not show how Johnson resolved the Federal Reserve's concerns with the 2019 transaction. It is unclear if the presumption was ever triggered.[107] In any case, Johnson notified the Federal Reserve of his 2020 sale of stock from DEW to D. Watson. The Federal Reserve neither objected to this sale nor determined that D. Watson was acting in concert with Johnson.[108]

Lastly, the CIBCA and the Voting Limitation are distinct. The CIBCA requires the Federal Reserve to approve transactions by persons acting independently or in concert that impact control of a state member bank or a bank holding company.[109] The Voting Limitation does not, however, mention or

---

[107] *Totta*, 2022 WL 1751741, at *5.

[108] *Id.* at *8 ("The Federal Reserve did not object to the sale, conclude that DEW was part of the Johnson Control Group, conclude that Johnson and DEW were acting in concert, or ask for any other information from Johnson after the sale to DEW.").

[109] *See* 12 U.S.C. § 1817(j); *see also* 12 C.F.R. § 225.41.

33

incorporate the CIBCA.[110] A finding under CIBCA could inform a finding under the Voting Limitation, but there is no basis for automatically importing a CIBCA finding in its place.

Having found that the Court of Chancery neither used the incorrect definition for "acting in concert" nor misapplied the burden of proof, we also uphold the court's factual determination that Johnson and D. Watson were not acting in concert. The court credited D. Watson's testimony regarding the lack of any agreement, arrangement, or understanding and found CCSB's arguments to the contrary unpersuasive. CCSB has not demonstrated that the court's factual findings were clearly wrong.

\* \* \*

Because we affirm the Court of Chancery's findings that the Conclusive and Binding Provision should be disregarded and the board's instruction to the inspector of elections was invalid, we need not reach whether the board's instruction to the inspector of elections survived enhanced scrutiny review.

## IV.

As a final matter, CCSB asks us to reverse the attorneys' fee and expense award to the plaintiffs. This Court reviews for abuse of discretion.[111] CCSB's only

---

[110] *See generally* App. to Opening Br. at A0020–23.
[111] *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011).

argument on appeal is that the court's ruling benefitted only the dissident slate of directors and therefore did not confer a benefit to CCSB. It relies on *Keyser v. Curtis*, like here an action brought under Section 225, where the directors seeking office prevailed in the action but were denied fees under the corporate benefit doctrine.[112] According to the court in *Keyser*, the suit "was principally motivated by a desire to benefit" one of the plaintiffs and not the corporation.[113]

*Keyser* well stated the general rule that, in a Section 225 action, the benefit is typically to the individuals seeking to confirm their board seats and fees and expenses should ordinarily not be awarded. But the Court of Chancery did not err or abuse its discretion by distinguishing *Keyser* and awarding fees in this case. The court found that the benefit in this case was greater compared to the benefit in *Keyser*. According to the court, by securing a judgment in their favor, the plaintiffs "fortifie[d] the Company's stockholder franchise generally" and "vindicated not only their own votes, but also the majority vote of the unaffiliated stockholders who properly elected the insurgent nominees."[114] The litigation also "prevent[ed] future stockholders from being similarly harmed by an erroneous application of the Voting Limitation" and "retroactively correct[ed] the incumbent board's interpretation of

---

[112] 2012 WL 3115453, at *19 (Del. Ch. July 31, 2012), *aff'd sub nom. Poliak v. Keyser*, 65 A.3d 617 (Del. 2013).

[113] *Id.*

[114] *Fee Decision*, at *3.

35

the Voting Limitation and, in effect, proactively set[] the interpretation for future elections."[115] We find no abuse of discretion with this ruling.[116]

## V.

We affirm the Court of Chancery's judgment.

---

[115] *Id.*

[116] It is unclear why the plaintiffs pursued this litigation solely against CCSB. Typically, the corporation is a nominal defendant in a Section 225 proceeding, with the members of the board of directors or officers named the primary defendants. *See Genger v. TR Invs., LLC*, 26 A.3d 180, 199–200 (Del. 2011) ("A Section 225 proceeding is not an *in personam* action. Rather, it is 'in the nature of an *in rem* proceeding,' where the 'defendants' are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or forever be barred from doing so. The one exception is the corporation itself, which is the entity that embodies the '*res*,' and is only party before the Court in its 'individual' capacity.'") (citations omitted); *see also Keyser*, 2012 WL 3115453, at *1 (indicating Ark Financial Services, Inc. as the nominal defendant alongside director and officer defendants); *Zhou v. Deng*, 2022 WL 1024809, at *1 (Del. Ch. Apr. 6, 2022), *aff'd*, 287 A.3d 633 (Del. 2022) (iFresh, Inc. was a nominal defendant alongside former officer and directors of the company); *Palisades Growth Cap. II, L.P. v. Backer*, 2020 WL 1503218, at *3 (Del. Ch. Mar. 26, 2020), *aff'd*, 246 A.3d 81 (Del. 2021) (QLess, Inc. as the nominal defendant alongside former directors of the company). CCSB did not raise an issue about it, and therefore we need not delve further into how it might have affected the litigation.